UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GLYNN GASTON,
    *Plaintiff*,
    *v.*
SUN SERVICES, LLC AND THE STATE OF
CONNECTICUT,
    *Defendants*.

Civil No. 3:11cv1970 (JBA)

March 26, 2014

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Defendants Sun Services, LLC ("Sun") and the State of Connecticut, University of Connecticut ("UConn") move [Doc. ## 47, 48] for summary judgment on Plaintiff Glynn Gaston's Complaint[1] [Doc. # 1-1] alleging (1) unlawful and retaliatory discharge in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* and Connecticut's Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1) against Sun (Count One) and UConn (Count Five); (2) hostile work environment against UConn (Count Five) (3) breach of the implied covenant of good faith and fair dealing against Sun (Count Two); (4) negligent infliction of emotional distress against Sun (Count Three) and UConn (Count Six); and (5) intentional infliction of emotional distress against Sun (Count Four) and UConn (Count Seven).

For the reasons that follow, Defendants' motions are granted as to the federal claims and the remaining claims will be remanded to state court.

---

[1] Plaintiff's Complaint was filed in the Superior Court for the Judicial District of New London at New London on November 22, 2011. Defendants removed this action to this Court on December 21, 2011. (*See* Notice of Removal [Doc. # 1].)

I.      **Facts**

In July 2008, Plaintiff, a black male, was hired by Defendant Sun, which had a contract with UConn to provide janitorial and cleaning services at the Avery Point campus in Groton, Connecticut.   Plaintiff was initially hired as a custodian and was promoted to site supervisor at Avery Point in December 2009.  (Gaston CHRO Aff., Ex. 5 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 55-3] ¶ 6.)

In Plaintiff's initial employment application, he was asked if he had "ever been convicted of an offense against civil law, forfeited bond or collateral or are there criminal charges currently pending against you?"  Plaintiff checked a box for "Yes" and in a space requesting an explanation wrote, "I haven't [had] problems w[ith] the law since 1996." (Applicant Stmt., Ex. 3 to Sun's Loc. R. 56(a)1 Stmt. [Doc. # 48-1] at 3.)   Although Plaintiff had a criminal history both before and after 1996, he testified at his deposition that he answered the question in this manner, because he believed that it was unclear. (Gaston Dep. Tr., Ex. 7 to Sun's 56(a)1 at 71.)  Plaintiff had been incarcerated from 1994 to 2002, and was convicted of assault in 2005.  Prior to 1996, Plaintiff also had several criminal convictions:  weapons possession in 1991, robbery in 1993, marijuana-related charges in 1993, manslaughter in 1994, and sale of a hallucinogen in 1996.  (Gaston Dep. Tr. at 77–79.)

Despite this partially untruthful information on the application form, Plaintiff testified that during his interview on the same day, he had disclosed his complete criminal history to his interviewer, Marcus Berrios.   (*Id.*)   According to Plaintiff, Berrios responded that "he had never had anyone be that honest with [him] and hired [Plaintiff] on the spot."  (*Id.* at 73.)  Berrios, however, denies that this incident occurred or that he

2

was involved in interviewing or hiring Plaintiff.  (*See* Berrios Aff., Ex. 12 to Sun's 56(a)1 ¶¶ 5, 7.)

As part of the application process, Plaintiff also signed an authorization form for Sun to conduct a criminal background check.  There is no indication in the record that Sun undertook any background investigation despite Plaintiff's truthful disclosure that he had a criminal history, and notwithstanding that Sun's Employee Handbook states that it "will not knowingly retain in its employment individuals who have been convicted of a felony or certain other offenses.  In the event that a criminal record is discovered after the employee is hired, he/she may be discharged."[2]  (Union Employee Handbook, Ex. 2 to Sun's 56(a)1 at 9.)   Moreover, Sun's contract with UConn mandated that Sun conduct criminal background checks of its employees and that "findings indicating criminal issues shall be brought to the attention of the contract coordinator [at UConn] for review," and Sun's "employees may be rejected" based on the results.  (Oct. 15, 2010 Ltr. Lang to Michaud, Ex. 5 to Sun's 56(a)1.)

When Plaintiff was promoted to supervisor at the Avery Point campus, he started to experience difficulties with UConn's general maintenance supervisor, Robert Woodhall, a white male.  Although the eight Sun employees at Avery Point were supposed to report to Plaintiff and not Woodhall, Woodhall repeatedly attempted to undermine Plaintiff's authority by telling Sun employees that he was their boss.  (Gaston Dep. Tr. at 35.)  After Gaston made complaints to his supervisors, Sun management held

---

[2] At oral argument, Sun explained that at the time, it did not conduct criminal background checks for employees like Plaintiff who were initially hired as temporary workers and then became permanently employed. The record, however, lacks competent evidence as to Sun's practice in this regard.

multiple meetings at Avery Point with the Sun workforce and instructed them that Gaston, not Woodhall, was their supervisor. (*Id.*) On March 5, 2010, Sun required each of its employees at Avery Point to sign a letter, confirming their understanding that Gaston was their supervisor and that failure to follow this instruction would result in progressive disciplinary action. (*See* Ex. 13 to Sun's 56(a)1)

UConn's Facilities Manager John Roccapriore, who became Woodhall's supervisor in August 2009, was also concerned at the start of his tenure that Woodhall was infringing on Sun's responsibility for supervising its own employees. Roccapriore observed that Woodhall had given Sun employees the impression that he was their boss and believed that Plaintiff's predecessor at Sun—who retired and was replaced by Plaintiff six months into Roccapriore's tenure—had allowed Woodhall to usurp this role.[3] (Roccapriore Dep. Tr., Ex. 6 to Sun's 56(a)1 at 12–14.) Roccapriore attempted to correct this misperception and instructed Woodhall that his role was to oversee the services provided by Sun but not to directly supervisor Sun employees. (*Id.* at 15.) Woodhall had been attending daily meetings that Plaintiff held at the end of each day for his subordinates, and Roccapriore instructed Woodhall that he should stop doing so. (*Id.*)

On February 22, 2010, Plaintiff also told Woodhall to stop attending these meetings, because his presence was disruptive and unnecessary given that he was

---

[3] When the position of site supervisor for Sun at Avery Point became available, Sun's Manager of the UConn account, Scott Weintraub, asked Roccapriore for input on who should be promoted to fill the position. (Roccapriore Dep. Tr. at 16–17; *see also* Weintraub Aff., Ex. 8 to Sun's 56(a)1 ¶ 4.) Roccapriore recommended Gaston, because he "recognized him as a good worker" and appreciated his "attitude, appearance, [and] work ethic." (Roccapriore Dep. Tr. at 16–17.)

employed by UConn, not Sun.  (Gaston Dep. Tr. at 36.)  Woodhall became very upset and said that he "was going to . . . put this boy in his place."  (*Id.* at 37.)

Two days later, in an incident that Plaintiff believed resulted from Woodhall attempting to retaliate against him, one of Plaintiff's crew members Orlando Federico called Plaintiff and asked for instructions about how to clean the student union. Although Federico had been performing this task for a number of years, Plaintiff explained to him his job responsibilities.  (*Id.* at 39.)  Federico became enraged and yelled that Plaintiff was not his boss.  (*Id.* at 40.)  Approximately thirty minutes later, Plaintiff was approached by UConn Police Sergeant Morin and Officer Dawson "like they were going to arrest [Plaintiff] and beat" him.  (*Id.*)  The officers told Plaintiff that Federico was claiming that Plaintiff had been yelling at him earlier in the day and that it caused Federico to have a heart attack.  (*Id.* at 41.)

At an unspecified point, but in Plaintiff's presence, Woodhall referred to his granddaughter's father as a "lazy nigger" while upset that his daughter needed money for her child, and the child's African-American father was not providing it.  (*Id.* at 37.)

As a result of these incidents, on March 15, 2010, Plaintiff handed a typed letter, dated March 12, 2010, to Louise Linsky, a principal of Sun who worked at its headquarters in Shelton.  (*See* Sun's CHRO Ans., Ex. 15 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 55-2] at 3; Pl.'s Mar. 12, 2010 Ltr., Ex. A to UConn Office of Diversity & Equity Report ("ODE Report"), Ex. 8 to Pl.'s 56(a)2, at 3.)  In the letter, Plaintiff stated that he wished to file a complaint against Woodhall for discrimination and harassment, describing Woodhall's efforts to undermine his authority and mentioning Woodhall's use of the pejorative term "boy."  *Id.*  On March 19, 2010, Linsky emailed a copy of the letter to

Anthony R. Weston, the Assistant Director of Regional Campuses and Administration at UConn, writing "[p]lease have the appropriate person contact me to discuss this very serious matter." (Ex. A to ODE Report at 2.) Linsky later arranged a meeting at Avery Point with UConn personnel, including Roccapriore and representatives from UConn's Office of Diversity and Equity ("ODE"). (Gaston Dep. Tr. at 59–60.) Gaston's March 12, 2010 letter was forwarded to the ODE on March 22, 2010 (Ex. A to ODE Report at 1), and on April 7, 2010, Plaintiff filed a formal complaint with the ODE, alleging racial discrimination and harassment. (ODE Report at 2.)

On July 26, 2010, the ODE issued a report, substantiating Plaintiff's allegations that Woodhall had used the term "nigger" in Plaintiff's presence and had referred to Plaintiff as "boy." (ODE Report at 2, 19.) The ODE found that Woodhall's denials were not credible given that Plaintiff's account was substantiated by several witnesses. (*Id.*) Nevertheless, the ODE concluded that these incidents of racial discrimination were "relatively sporadic" and thus were not sufficient to create a "hostile work environment." (*Id.* at 21.)

The report concluded that Woodhall's hostility toward Plaintiff was primarily motivated by a "power struggle" rather than racial discrimination, because Woodhall had initially supported Plaintiff's promotion to supervisor and only started to have issues with Plaintiff after he disciplined Woodhall's relative—who worked for Sun at Avery Point— for insubordination and violation of Sun's vacation policy, and asserted control over Sun employees. (*Id.* at 22.) The ODE Report concluded that "the workplace has been permeated by mistreatment, favoritism, inappropriate language, demeaning comments, gamesmanship and generally unprofessional conduct," but there was insufficient

evidence to conclude that Plaintiff had been subject to discriminatory harassment specifically on account of his race. (*Id.*)  As a result of the ODE findings, on October 22, 2010, Roccapriore sent Woodhall a letter of reprimand.  (Oct. 22, 2010 Ltr. Roccapriore to Woodhall, Ex. 11 to Pl.'s 56(a)2)

After filing the ODE complaint, Plaintiff experienced additional incidents of discrimination and retaliation.  Woodhall's wife—who also worked at Avery Point for UConn—filed several unfounded complaints regarding Plaintiff's job performance.  (Pl.'s CHRO Aff. ¶¶ 13–16.)  On September 23, 2010, Sgt. Morin and Officer Dawson questioned Plaintiff regarding an air conditioner that Woodhall had reported was stolen from a building, and Officer Dawson approached Plaintiff "in an intimidating fashion and made [him] very uncomfortable." (*Id.* ¶ 23.)  The following day, Plaintiff observed Sgt. Morin—who was friends with Woodhall—rummaging through his desk while Woodhall stood outside.  (*Id.* ¶ 24.)   After these incidents Plaintiff notified his superiors at both UConn and Sun.  (Gaston Dep. Tr. at 50.)

On October 14, 2010, Plaintiff filed a complaint against UConn with the Connecticut Commission on Human Rights and Opportunities (CHRO), outlining the incidents that formed the basis for his ODE complaint and the instances of retaliation that he experienced afterwards.[4]  (*See* Pl.'s CHRO Aff. at 1.)  The following day, Philip Lang, a Purchasing Agent employed by UConn, drafted a letter to Sun, requesting that

---

[4] The CHRO received this complaint on October 19, 2010, and on October 25, 2010, served it on UConn (Dec. 13, 2010 Ltr. Michael J. Eagen, UConn to James M. Flynn, CHRO, Ex. 16 to Pl.'s 56(a)2)  Sun was not aware of this CHRO complaint against UConn until several weeks after Plaintiff's termination.  (Linsky Aff. ¶ 9, Ex. 11 to Sun's 56(a)1.)

Sun perform background checks on its employees working at UConn. Under Sun's contract with UConn it was required to perform background checks on each of its employees before he or she started working at the university and every six months thereafter and to provide the reports to UConn. Lang noted that Sun had not been complying with this requirement. (*See* Oct. 15, 2010 Ltr. Lang to Michaud.)

On November 5, 2010, Sun asked Plaintiff to sign an authorization form so that it could conduct a criminal background check.[5] (Gaston Dep. Tr. at 100; *see also* Background Authorization Form, Ex. 9 to Sun's 56(a)1.) The background check revealed Plaintiff's criminal history, and on November 19, 2010, Linsky called a meeting with Plaintiff and informed him that he was being terminated for lying on his employment application with Sun and not disclosing his criminal background. (Gaston Dep. Tr. at 100.) Linsky explained that "this was a very a difficult separation," because Sun "recognized and appreciated [Plaintiff's] superior job performance." (Sun's Ans. to CHRO Aff., Ex. 15 to Pl.'s 56(a)2 ¶ 12.)

Plaintiff explained that he had disclosed this information at his job interview to Berrios, but Linsky replied that Sun could not take "any risks" and would have to terminate him.[6] (Pl.'s CHRO Aff., Ex. 5 to Pl.'s 56(a)2 ¶ 12.) Linsky presented Plaintiff with a separation agreement, offering him four weeks of pay in exchange for releasing

---

[5] Plaintiff alleges that Sgt. Morin sent a package to Sun with information regarding Plaintiff's criminal background "in an effort to have Plaintiff removed from his position." (Compl. ¶ 11; Gaston Dep. Tr. at 57.) At oral argument, Plaintiff's counsel acknowledged that there is no record evidence to support this theory.

[6] Linksy denies that she made this statement and denies that Plaintiff told her during the meeting that he had disclosed his convictions to Berrios at his initial interview. (*See* Sun's CHRO Ans. at 7.)

Sun from liability for any potential legal claims against it, including for discrimination, but Plaintiff declined to sign the agreement.  (*See* Separation Agreement, Ex. 12 to Pl.'s 56(a)2 at 1–3.)

Sun acknowledges that it was an "unusual step" (Sun's Mem. Supp. [Doc. # 48-1] at 8 n.1) to offer Plaintiff a separation agreement despite terminating him on the basis of willful misconduct but did so because of Plaintiff's superior job performance (Sun's CHRO Ans. ¶ 12.)  Prior to his termination, Plaintiff had received very positive reviews of his job performance.  Sun's Manager of the UConn account, Scott Weintraub, often told Plaintiff "that he was doing a great job, the campus looked great" and his client contact, Roccapriore, at UConn "was thrilled with his job performance."  (Weintraub Aff. ¶ 6.) Roccapriore recommended Plaintiff for a promotion after recognizing him as a "good worker." (Roccapriore Dep. Tr. at 16.)

On November 29, 2010, Plaintiff filed a CHRO complaint against Sun, alleging that his termination was retaliation for his discrimination complaints against UConn and was based on racial discrimination.  (*See* Pl.'s CHRO Aff..)

## II.      Discussion[7]

### A.      Unlawful Termination

To meet the minimal burden of establishing a prima facie case of discrimination in the termination context under the *McDonnell Douglas* framework, "a plaintiff must show that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class."[8] *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  If shown, "the burden shifts to the employer to articulate a legitimate, non–discriminatory reason for the employee's dismissal.  If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

---

[7] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

[8] "The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010).

Pretext can be established "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. The separate stages of a plaintiff's demonstration of a prima facie inference of discrimination and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002).

To prove pretext, the "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alterations and internal quotation marks omitted). "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'   In other words, '[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146–47 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 519 (1993)) (internal citations omitted) (alterations in original).

### 1.   UConn

As a threshold matter UConn disputes that it is liable under Title VII, because Sun—not UConn—employed Plaintiff.   "[T]he existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. New York State Educ.*

*Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). Plaintiff asserts that despite not being his direct employer, UConn had sufficient ties to Plaintiff to be considered a "joint employer" subject to Title VII liability. (Pl.'s Opp'n to UConn [Doc. # 51] at 9.)

> In determining whether such an employment relationship exists
>
> the Supreme Court culled the following non-exhaustive, thirteen-factor list of considerations from federal case law and the Restatement (Second) of Agency: "the hiring party's right to control the manner and means by which the product is accomplished . . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 371–72 (2d Cir. 2006) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989) (alterations in original)). "[T]he question whether a defendant is a plaintiffs' joint employer is a mixed question of law and fact," which is "'especially well-suit for jury determination.'" *Ling Nan Zheng v. Liberty Apparel Co. Inc.*, 617 F.3d 182, 185–86 (2d Cir. 2010) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).

Plaintiff asserts that because under UConn's contract with Sun, UConn had "extraordinary control" over Sun employees, UConn qualifies as a joint-employer. (Pl.'s Opp'n to UConn at 11.) Under this contract, UConn (1) had the right to approve the work schedules for Sun employees (*see* UConn-Sun Contract, Ex. 13 to Pl.'s 56(a)2 § 1.4.2); (2) could require Sun to hire more permanent workers if UConn determined it to

be necessary (*id.* § 1.4.2.4); (3) could require Sun employees to wear a uniform that it approved (*id.* §§ 1.4.3.6, 1.4.3.8); (4) required Sun employees to attend a training program that it designed; (5) defined the roles and job title of Sun employees, including site manager, supervisor, and janitor (*id.* § 1.4.3.6); (6) provided descriptions of how Sun employees would perform required tasks, such as mopping, emptying trash containers, and vacuuming (*id.* § 1.19); and (7) provided Sun employees with the cleaning products and chemicals that they would use (*id.* § 1.50).   Additionally, Plaintiff contends that UConn employees exercised influence over Sun's personnel decisions, including promotions of its employees and the right to reject employees on the basis of their criminal background, and supervised the day-to-day tasks of Sun personnel.  (Pl.'s Opp'n to UConn at 14.)

While UConn contends that it is not Plaintiff's joint-employer, because it "had no input and had no say in either the hiring/and or termination" of Plaintiff (UConn's Mem. Supp. [Doc. # 47-1] at 9), the record shows that UConn did in fact have a role in Plaintiff's promotion to supervisor for Sun at Avery Point when Roccapriore recommended him to Sun for the vacant position.   Additionally, notwithstanding the contractual relationship between Sun and UConn, it is not disputed that Woodhall asserted control over Sun employees at Avery Point and gave them the impression that he was their supervisor.

The Second Circuit has emphasized that in determining if an employment relationship exists, courts must look at whether an entity has "functional control over workers even in the absence of the formal control." *Zheng*, 355 F.3d at 72.  While the analysis of the degree of control over an employee's work is not intended to "encompass

run-of-the-mill subcontracting relationships . . . a defendant's extensive supervision of a plaintiff's work is indicative of an employment relationship . . . if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726 (1947)). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* In *Zheng*, apparel manufacturers contracted with various subcontractors to stitch and finish pieces of clothing on the manufacturer's premises according to the manufacturers' specifications. The Second Circuit held that the manufacturer had "functional control over workers even in the absence of . . . formal control" in part because, the manufacturer's premises and equipment were used for the plaintiffs' work; the manufacturer or its agents supervised the plaintiffs' work; and the plaintiffs worked exclusively or predominantly for the manufacturer. *Zheng*, 355 F.3d at 72.

Based on UConn's extensive contractual control over Sun employees and the additional control that Woodhall exercised over such employees beyond that contemplated by the contract, Plaintiff has at least demonstrated a genuine issue of disputed fact as to whether UConn was his joint employer. Even assuming that UConn was a joint employer, however, Plaintiff has offered no evidence that UConn was involved in the decision to terminate Plaintiff's employment with Sun. Although UConn requested that Sun perform background checks on all of its employees immediately before Plaintiff's termination, this was a preexisting requirement of the contract between Sun and UConn (*see* Oct. 15, 2010 Ltr. Lang to Michaud ), and there is no evidence that

this request was directed at Plaintiff or intended by UConn to lead to Plaintiff's termination. Additionally, there is no evidence that UConn was aware of the results of Plaintiff's criminal background check, and the record shows that Sun acted unilaterally to terminate his employment without input from UConn. While Plaintiff has proffered evidence of racial discrimination that he endured from Woodhall and potentially from two UConn police officers, there is no evidence that these employees could or did influence Sun's decision to terminate Plaintiff's employment. Accordingly, UConn's motion for summary judgment is granted with respect to Plaintiff's discriminatory termination claim in Count Five.

### 2.   *Sun*

Sun argues that even assuming that Plaintiff can make a prima facie showing of discrimination, it is entitled to summary judgment because Plaintiff has failed to rebut Sun's legitimate non-discriminatory explanation for his termination. (Sun's Mem. Supp. at 15.) Sun contends that it legitimately terminated Plaintiff because he falsified his employment application and due to the criminal convictions themselves. In support of this assertion, Sun notes that its Employee Handbook provides that will not "knowingly retain" convicted felons as employees and provides that it "may" discharge an employee upon discovering such a conviction. (*See* Employee Handbook at 9.) It further prohibits "[f]alsifying reports or records . . . or willfully giving false information." (*Id.*)

"[A]n employee may satisfy the ultimate burden of proving pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of

credence.'" *Dister v. Cont'l Grp., Inc.*, 859 F.3d 1108, 1113 (2d Cir. 1988) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The pretext inquiry includes factual questions such as "'whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non–discriminatory purpose was stated only after the allegation of discrimination.'" *Xu-Shen Zhou v. State Univ. of New York Inst. of Tech.*, 499 F. App'x 105, 109 (2d Cir. 2012) (quoting *DeMarco v. Holy Cross High. Sch.*, 4 F.3d 166, 171 (2d Cir. 1993)).

Even assuming Plaintiff has satisfied the first three elements of his prima facie case, Plaintiff's discrimination claim against Sun fails because Plaintiff has not produced evidence supporting an inference of discrimination in connection with his termination by Sun.  In his opposition to summary judgment on this count, Plaintiff did not address this requirement or otherwise advance an argument that his termination was motivated by discrimination.  (*See* Pl.'s Opp'n to Sun [Doc. # 55-1] at 6–7.)  Plaintiff's allegations of discriminatory conduct are all directed against Woodhall and other UConn employees and Plaintiff has not offered any evidence of racially discriminatory animus on the part of Sun employees.  Further, the same personnel at Sun who hired and promoted Plaintiff made the decision to terminate his employment.  *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (Where "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (internal citation omitted)).

16

At oral argument, Plaintiff in effect acknowledged that the evidence would not support his discriminatory termination claim against Sun and that it was not a viable claim unless the actions of UConn employees could be imputed to Sun.  However, even assuming that Sun and UConn are considered joint employers, Plaintiff has offered no evidence to connect the behavior of Woodhall with his ultimate termination.  That is, he has not shown that Woodhall played any role in his termination or that his termination was otherwise caused by discriminatory animus.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("The plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].").  Therefore, Sun's motion for summary judgment is granted with respect to Plaintiff's discriminatory termination claim in Count One.

### B.    Retaliation

The burden-shifting framework laid out in *McDonnell Douglas* also governs retaliation claims under Title VII.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  *Id.* (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its

action." *Id.* (quoting *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir. 2001)). "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa*, 708 F.3d at 125. Further, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision. However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)).[9]

  *1. Sun*

  Sun argues that Plaintiff cannot demonstrate that his November 19, 2010 termination was retaliation for protected activities under Title VII, because Plaintiff did not file a complaint against Sun until November 29, 2010, after his termination. (Sun's Mem. Supp. at 16.) Sun is correct that a retaliation claim based on the CHRO complaint

---

[9] Although the Connecticut Supreme Court has not yet addressed whether the *Nassar* formulation of causation applies under the CFEPA, *see Consiglio v. Cigarette*, CV126027652S, 2014 WL 783471 (Conn. Super. Ct. Jan. 27, 2014), ("[O]ur Supreme Court has not yet adopted *Nassar's* narrow definition of the word 'because' and applied it to a claim brought under § 31–290a."), the Second Circuit has suggested that *Nassar* does not alter the district court's analysis at summary judgment, *see Zann Kwan*, 737 F.3d at 846 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

against Sun is not viable as there could be no causal connection between the two.  *See Summa*, 708 F.3d at 125.   As Sun acknowledges, however, Plaintiff alleges that his October 14, 2010, CHRO complaint *against UConn* was the reason that Sun later terminated him and that it did so to protect its lucrative contract with UConn.  (*See* Compl. ¶ 10.)  This complaint was received by the CHRO on October 19, 2010, and Plaintiff was terminated exactly one month later.   However, at the time of Plaintiff's termination, Sun was not aware that he had filed this complaint.  (*See* Linsky Aff. ¶ 9.)  Without evidence of Sun's awareness, Plaintiff cannot establish a prima facie case of retaliation against Sun based on Plaintiff's CHRO complaint against UConn.  *See Summa*, 708 F.3d at 125.   At oral argument, however, Plaintiff asserted that he had a viable retaliation claim based on his March 2010 complaint to Linsky that resulted in his ODE complaint the following month.  It is undisputed that this internal complaint with ODE is a protected activity.  *See La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 212 (2d Cir. 2010) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management.").

Plaintiff contends that that the fourth element of a prima facie case of retaliation based on the ODE complaint is established based on the temporal proximity between his March 2010 letter to Linsky and the ODE, and his termination just over eight months later in November 2010.  In this timeframe, Plaintiff alleges that there were additional incidents with Woodhall that he reported to management at both Sun and UConn, including the September 2010 incidents in which Sgt. Morin and Officer Dawson aggressively approached him and searched his desk.

19

A plaintiff's "presentation of a temporal connection" can be "enough, in and of itself . . . to permit a reasonable jury to find causation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013).  However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).  There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," and a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa*, 708 F.3d at 128 (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009). *Compare Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity), *with Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection).

In *Espinal*, 558 F.3d at 129, for example, the Second Circuit held that a six-month gap between a protected activity—an inmate's filing of a civil rights lawsuit—and a retaliatory severe beating by officers was sufficient to establish a causal connection, because "[i]t is plausible that the officers waited to exact their retaliation at an opportune time—as when Espinal was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by Espinal."  Likewise in *Summa*, the Second

Circuit held that a four-month timespan was sufficient to show causation when a football manager filed a complaint against her employer "based on events that occurred on the very last day of the fall season" and the "start of the spring season was the first moment in time when the football coaching staff could have retaliated against Summa as she was not directly working for them over the intervening months."  708 F.3d at 128.

Even if the eight-month gap in this case is not too remote to establish temporal proximity "for the purposes of establishing a prima facie case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

It is undisputed that Sun was aware of Plaintiff's ODE complaint approximately eight months before his termination, but the other evidence in the record does not support a reasonable inference of a causal link between the complaint and his termination.  It is undisputed that Sun transmitted Plaintiff's letter of complaint to UConn, which set in motion the process by which Plaintiff filed a formal complaint with ODE.  Plaintiff does not dispute that Linsky was supportive of his filing of the complaint and she attended a meeting at UConn to address the issues that Plaintiff brought to her attention.  Although Plaintiff's theory is that Sun retaliated against him to avoid friction in its relationship with UConn, there is no evidence that Plaintiff's ODE complaint caused any such friction, particularly where Roccapriore supported Plaintiff's efforts to reassert control over Sun's employees from Woodhall.

Acknowledging this record at oral argument, Plaintiff suggested that the relevant temporal connection is between the issuance of the ODE Report on July 26, 2010 and his

termination approximately four months later.  Plaintiff surmises that while Sun was supportive of Plaintiff filing the ODE complaint, after the ODE Report substantiated those allegations, it had an incentive to retaliate because the issuance of the report showed Sun that Plaintiff's problems with UConn personnel were going to continue.  Even if it could be plausible that Sun would retaliate against Plaintiff after an investigation vindicated allegations that Sun helped him file, the Supreme Court's reasoning in *Breeden* casts doubt on the viability of Plaintiff's theory that the timing of the ODE report supports causation.  In *Breeden*, the plaintiff was involuntarily transferred after filing a lawsuit, but the employer was not aware of the lawsuit at the time of the transfer and thus the employee could not demonstrate causation.  The plaintiff's theory that the EEOC's issuance of a right-to-sue letter was the basis for her employer's retaliation was rejected as an "utterly implausible suggestion that the *EEOC's* issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee."  532 U.S. at 273.  Similarly, the issuance of the ODE Report, an action in which Plaintiff took no part, cannot have been a protected activity in this case.

Accordingly, Sun's motion for summary judgment on the retaliation claim in Count One is granted.

### 2.    UConn

The conclusion that UConn was not involved in Plaintiff's termination, discussed *supra*, forecloses its liability for retaliatory discharge.  Plaintiff also alleges that before his termination, he faced retaliation when, in September 2010, UConn police officers "approached him in an aggressive and intimidating fashion" after Plaintiff accused Woodhall of having stolen an air conditioner and the following day when Sgt. Morin was

found searching Plaintiff's desk.  (Pl.'s Opp'n to UConn at 21.)  "'[U]nchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [third] prong of the retaliation *prima facie* case.'"  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26–27 (2d Cir. 2014) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (second alteration in original)).  To demonstrate that he or she has suffered from an adverse employment action to support a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).  Still, "[a]ctions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse."  *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington Northern,* 548 U.S. at 68).

Given that these incidents occurred more than six months after Plaintiff filed his ODE complaint and there is no other indication that they were related to Plaintiff's complaint, Plaintiff has not demonstrated a causal relationship between his complaint and the actions of the UConn police officers.  Even if causation could be assumed, however, these two incidents are not sufficiently severe to constitute unchecked retaliation by a co-worker to support a retaliation claim.  *Cf. Richardson*, 180 F.3d at 446–47 ("The evidence Richardson presented shows that she was the target of abusive treatment from her co-workers at CCF after filing her lawsuit.  This included manure in her parking space, hair in her food, a rubber band shot at her, and scratches on her car.").

Accordingly, UConn's motion for summary judgment on the retaliation claim in Count Five is granted.

### C.     Hostile Work Environment

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (alterations in original)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* Courts consider the conduct alleged in terms of frequency, severity, its physical, threatening, or humiliating characteristics, and whether the conduct unreasonably interferes with work performance, which generally connotes a fact intensive inquiry. *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119.

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*; *cf. e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes was sufficiently severe to support a hostile work environment claim). Finally, it is

"axiomatic" that in order to establish a race-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of his or her race. *Id.*

Viewing the evidence in the light most favorable to Plaintiff, the Court assumes that he can establish an employment relationship with UConn and that Woodhall made two racists comments—referring to Plaintiff as "boy"[10] and using the word "nigger" in Plaintiff's presence.

Frequent racial slurs can certainly constitute evidence that renders a work environment both subjectively and objectively racially hostile. *See Torres v. Pisano*, 116 F.3d 625, 632–33 (2d Cir. 1997) ("[A] reasonable Puerto Rican would find a workplace in which her boss *repeatedly* called her a "dumb spic" and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics" to be hostile. Torres has therefore established a strong prima facie case of sexual harassment.") (emphasis added); *Petrosino v. Bell Atlantic*, 385 F.3d 210, 222 (2d Cir. 2004) (finding that the district court had erred in granting summary judgment to employer where "[s]uch workplace disparagement of women, *repeated day after day over the course of several years* without supervisory intervention, stands as a serious impediment to any woman's efforts to deal professionally with her male colleagues.") (emphasis added); *Terry v. Ashcroft*, 336 F.3d 128, 149 (2d Cir. 2003) ("[P]laintiff is not complaining merely about sporadic and isolated events, but rather about his daily working conditions."); *Pucino*, 618 F.3d at 119

---

[10] It cannot be disputed that the use of the word "boy" in the context in which it was allegedly used would be racially offensive. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1142 (10th Cir. 2008) ("As typically used in everyday English, there is nothing inherently offensive about the word 'boy.' Nevertheless, it is a term that has been used to demean African–American men, among others, throughout American history.").

(concluding that plaintiff presented issues of disputed fact sufficient to withstand summary judgment where her affidavit stated that the alleged abuse concerning "most of the major aspects of Pucino's employment," including "[w]ork assignments, the provision of tools, the use of a bucket truck, the issues as to use of restrooms, and the verbal abuse" occurred "constantly" or "frequently").   Here, the racist comments by Woodhall, while offensive, constitute two isolated incidents insufficient to support a hostile work environment claim.   No reasonable juror could find that these incidents constituted "pervasive harassment" or resulted in a workplace "permeated with discriminatory intimidation . . . sufficiently severe or pervasive to alter the conditions" of Plaintiff's employment.   Thus, Sun's motion for summary judgment on the hostile work environment claim in Count Five is granted.

### D.    Remaining State Law Claims

Where, as here, a federal court has dismissed before trial the only basis for federal jurisdiction, it has discretion under 28 U.S.C. § 1367(c) to either retain or decline jurisdiction over any remaining state law claims.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) ("Even if only state-law claims remained after resolution of the federal question, the District Court would have discretion, consistent with Article III, to retain jurisdiction.").  A "federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point

26

toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.  Weighing these factors the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and accordingly Counts Two, Three, Four, Six, and Seven are remanded to state court.[11]  *See id.* at 357 ("We conclude that a district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate.").

## III.   Conclusion

For the reasons discussed above, Defendants' motions [Doc. ## 47, 48] for summary judgment are GRANTED on Counts One and Five.  Counts Two, Three, Four, Six, and Seven are REMANDED to the Superior Court for the Judicial District of New London at New London.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of March, 2014.

---

[11] Plaintiff "does not contest" dismissal of his claims against Sun for intentional and negligent infliction of emotional distress and breach of the covenant of good faith and fair dealing (Pl.'s Opp'n to Sun at 13–14), and its claim against UConn for negligent infliction of emotional distress (Pl.'s Opp'n to UConn at 25).